UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States *ex rel.* John Doe,<br><br>                    Plaintiff-Relator,<br><br>        v.<br><br>Staples, Inc.<br>500 Staples Drive<br>Framingham, MA 01702,<br><br>OfficeMax, Inc.<br>263 Shuman Blvd.<br>Naperville, IL 60563,<br><br>Target Corp.<br>1000 Nicollet Mall<br>Minneapolis, MN 55403, and<br><br>Industries for the Blind, Inc.<br>445 S. Curtis Rd.<br>West Allis, WI 53214.<br><br>                    Defendants. | No. 08-cv-846 (RJL) |

## DEFENDANT OFFICEMAX INCORPORATED'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Defendant OfficeMax Incorporated (incorrectly referred to in the Complaint as "OfficeMax, Inc." and hereafter "OfficeMax") submits this Reply in support of its Motion to Dismiss.

Relator asks for anonymity, claiming that the public interest supports it. The government, however, is the real party in interest and is fully capable of vindicating the public's interest, whether the relator pursues his claim or not. Relator himself has but one interest in this litigation—recovering a whistleblower's bounty. That interest does not come remotely close to warranting the extreme and unusual procedure of allowing him to proceed anonymously, particularly in a False Claims Act context. Relator's choice is to either litigate publicly as OfficeMax must, or forego his bounty and let the government take any action it

believes is warranted.  What he cannot do is use a pseudonym to severely impede OfficeMax's ability to defend itself, including for example, by prohibiting OfficeMax from referencing relator's name in conducting an investigation and defense of his claims.

If relator is required to identify himself, and he chooses to do so, his Complaint still fails.  First, the Complaint states in no uncertain terms that the Chinese-origin of the pencils is apparent from visible, physical characteristics.  Relator does not dispute that those characteristics are available from pictures on the internet.  Relator also fails to make any effort to substantiate his status as the original source, opting instead to impermissibly request an opportunity to meet his burden in some future pleading.  Second, the Complaint fails to meet the pleading requirements of the Federal Rules for several reasons: it fails to identify a single person at OfficeMax involved in an alleged fraud, improperly relies on the discredited collective knowledge theory, and—if relator's Response is believed—does not even allege scienter. Third, relator seeks to withdraw one of his counts, defends another on the basis of an incomplete and misleading quotation of the relevant statute, and improperly asks that yet another count not be dismissed so that he can find out in discovery if it is valid.

OfficeMax therefore requests that the Court require relator to proceed with his bounty claim publicly, and if he is willing to do so, that the Complaint be dismissed for lack of jurisdiction, for failure to meet pleading requirements, and for failure to state a claim.

## A.    Relator has not Justified His Request for Anonymity, Which Would Substantially Prejudice OfficeMax.[1]

Relator identifies the five facts that courts in this district occasionally use to guide their decisions on requests for anonymity: (1) whether the proffered justification is merely to

---

[1] As an initial matter, Relator claims he followed the procedure envisioned by *Qualls v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005) by receiving from Chief Judge Lamberth an initial order allowing him to proceed anonymously.  (Pl's Opp. to Def. OfficeMax Incorporated's Mot. to Dismiss ("Resp."), Dkt. No. 46 at 6.) OfficeMax cannot assess that claim, since the order is apparently under seal.  (*Id.*)  Even if it were true, however, such an order is only temporary and preliminary.  *Qualls*, 228 F.R.D. at 10 (when the Chief Judge grants preliminary authorization to proceed anonymously it is "entirely appropriate for defendant or for the Court to later questions plaintiffs' use of pseudonyms and for the Court to review the issue de novo").

avoid annoyance and criticism inherent in all litigation, or is to preserve information of a sensitive and highly personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the party or to innocent third parties; (3) the age of the party requesting anonymity; (4) whether the defendant is a government; and (5) the risk of unfairness to the opposing party. *Nat'l Assoc. of Waterfront Employers v. Chao*, 587 F. Supp. 2d 90, 99 (D.D.C. 2008).

Factors (3) and (4) obviously favor disclosure. Relator is not a minor, and OfficeMax is not a government. Factor (1) also counsels against anonymity, because "[m]atters of a sensitive and highly personal nature include those dealing with birth control, abortion, homosexuality or the welfare rights of illegitimate children or abandoned families." *Id.* at 99, n. 8. None of those issues presents itself here. That leaves only factors (2) (relator's justification) and (5) (unfairness to OfficeMax) that could even potentially weigh in favor of anonymity.

### 1.      Relator's proffered justification is insufficient.

Relator offers two justifications for remaining anonymous. First, "if [his] Asia-based suppliers to [his] businesses become aware of the allegations in the lawsuit, it could jeopardize [his] business dealings with them." (Decl. of Relator John Doe ("Doe Decl"), Dkt. No. 47-1, ¶ 5.; *see also id.*, ¶ 6 ("[T]hese companies and even government entities could take steps to harm me in my business to deter further disclosure of the violation of U.S. law by me or others").)[2]

---

[2] Relator signed the declaration not with his real name, but with "John Doe." (Doe Decl. at 3.) Declarations should generally be signed with the declarant's real name. *See Berger v. Cleveland Clinic Found.*, 2007 WL 2902907, *21, n.9 (N.D. Ohio 2007) (striking affidavit of Jane Doe because it was anonymous and declarant did not identify herself).

Potential harm to one's business is insufficient.  A "threat of economic harm alone does not generally permit a court to let litigants proceed under pseudonym." *Qualls*, 228 F.R.D. at 12; *see also Chao*, 587 F. Supp. 2d at 99-100 ("Pseudonymous litigation has been permitted only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity") (quotation omitted).

Further, relator's claims have injured OfficeMax's business and therefore he should not be heard to complain about the potential impact to his business that may result from his pursuit of a whistleblower's bounty.  Relator publicly accused OfficeMax of defrauding the federal government, and such "public charges of fraud can do great harm to the reputation of a business firm or other enterprise…" *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999).  Relator's Complaint has been unsealed.  OfficeMax had no opportunity to proceed as a "John Doe" to shield itself from the public airing of relator's allegations. Relator is entitled to no better treatment.  *See S. Methodist Univ. Assoc. of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979) (because defendant was "publicly accused of serious violations of federal law[,]…[b]asic fairness dictates that those among the defendants' accusers who wish to participate in this suit…must do so under their real names").

Second, relator posits potential physical harm.  His assertions are vague, to say the least.  According to an unnamed "legal counsel in Asia," the Far East "is a region in which one's movements can often be made known to business rivals."  (Doe Decl., ¶ 6.)  That same legal counsel "believes it is possible, and [relator] share[s] his belief," that if relator's name is disclosed, "even those outside [his] industry might physically threaten [him] or [his]

family." (*Id.*)  Relator additionally claims to have "engaged several investigators" to conduct

an investigation, and those investigators—also unnamed—"have expressed apprehension

about having their identities revealed for fear of their economic and physical well-being."

(*Id.*, ¶ 7.)  Relator "respect[s] their knowledge of conditions and circumstances existing in

these countries."  (*Id.*)  He has "no information which gives [him] comfort that their fears are

unfounded, and do[es] not want to take the risk that the threat may prove real."  (*Id.*)

A plaintiff's proffered justification for proceeding anonymously may not be "vague

and unsubstantiated."  *Yaman v. United States Dep't of State*, 786 F. Supp. 2d 148, 153

(D.D.C. 2011).  Additionally, "discussions amongst plaintiffs and their attorneys about

unsubstantiated and vague concerns about filing the present lawsuit does not show a

likelihood of retaliation…"  *Qualls*, 228 F.R.D. at 12 (quotation omitted).

It is worth comparing relator's claims with those of the plaintiffs in *Qualls*.  The

*Qualls* plaintiffs were soldiers challenging the Army's Stop Loss program during the height

of the Iraq war.  *Qualls*, 228 F.R.D. at 9.  They sought to prosecute their case with their

names under seal because, they argued, "should their real names come to light, there would

be a potential for…retaliatory conduct that could lead to Doe plaintiffs' injury or death while

serving in combat."  *Id.* at 11.  Yet even in that context, claimed fear of injury or death was

insufficient.

Likewise, relator's suggestion of physical harm falls well short.  He bases his fear

primarily on advice from an unnamed Asia-based attorney and conversations with unnamed

investigators.  (Doe Decl., ¶¶ 6-7.)  Such claims must be disregarded as hearsay.  *Qualls*, 228

F.R.D. at 12 (rejecting declarations because they "do not speak from personal knowledge;

rather, they make claims based on what their daughter or husband allegedly confided in them.

The claims are unreliable hearsay").  The only supposed fact relator cites is that in Asia, "one's movements can often be made known to business rivals."  (Doe Decl., ¶ 6.)  It is not clear how that differentiates Asia from America, but in any event, the ability of business competitors to know a party's whereabouts is not enough to justify anonymous litigation.

The cases relator cites also do not justify anonymity.  The plaintiff in *Yaman* asked that her minor daughters—who fled from their estranged father after he sexually abused them—be allowed to file their address under seal when seeking unrestricted American visas. *Yaman*, 786 F. Supp. 2d at 152-53.  The only harm claimed by the State Department (the defendant) was an inability to assist the father in determining the proper jurisdiction in which to file a separate action at some point in the future seeking return of the children.  *Id.* at 154.

Relator cites *United States v. Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1980), but that case decided whether documents seized during a criminal investigation were sealable; it said nothing about pseudonymous parties.  Similarly, *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268 (D.D.C. 1991) involved sealing records, not anonymity for a party.  *Id.* at 1277.  A third case relator cites, *In re New York Times Co.*, 585 F. Supp. 2d 83 (D.D.C. 2008) did deal with anonymity, but for informants in criminal cases, who are afforded an explicit informer's privilege to provide information while withholding their identities.  *Id.* at 91 (relying on *Roviaro v. United States*, 353 U.S. 53, 59 (1957)).  Relators under the Act have no such privilege.

Relator finally cites *Whistleblower 14106-10W v. Comm'r of Internal Revenue*, 173 T.C. 183 (2011), but that case is inapposite.  First, it was a Tax Court case, and the Tax Court rules specifically contemplate the possibility of anonymous litigation.  *Id.* at 191.  The Federal and Local Civil Rules, in contrast, contemplate no such thing.  *Qualls*, 228 F.R.D. at

10.  Second, the *Whistleblower* court itself noted important differences between tax cases and cases under the False Claims Act that make anonymity more appropriate in tax cases. *Whistleblower*, 137 T.C. at 199.  Third, the defendant was the government rather than a private company.

In short, relator's proffered justifications are insufficient.  Relator does not cite a *single* FCA case in which the relator was permitted to proceed anonymously, despite the obvious risks to whistleblowers.  There is no basis for this Court to take the unprecedented and extreme step of permitting a John Doe relator.  Moreover, as discussed below, relators' reasons also pale in comparison to the prejudice OfficeMax would face if relator were allowed to proceed anonymously.

## 2.   OfficeMax will be prejudiced even if it knows relator's name privately.

Relator proposes to provide his name to OfficeMax, but in strict confidence.  (Resp. at 8.)  Relator asserts that such a procedure will eliminate any prejudice OfficeMax faces. (*Id.*)  Relator is incorrect.  Allowing relator to proceed anonymously will significantly hamper OfficeMax's ability to defend itself, even if OfficeMax knows his name.

To take just one example of the prejudice OfficeMax will face, consider relator's declaration.  According to relator, people with relevant knowledge include his "legal counsel in Asia," (Doe Decl., ¶ 6), his "suppliers in some of the countries that transship pencils," (*id.*, ¶ 5), "several investigators" who assisted his investigation (and whose identities, it appears, relator also believes should remain confidential), (*id.*, ¶ 7), people involved in "widespread discussion at trade shows and individual and industry meetings of the likelihood that Chinese-made pencils were being transshipped," (*id.*, ¶ 10), and, of course, employees of the "individual suppliers" named in the Complaint, (*id.*, ¶ 11).  To defend itself, OfficeMax must interview or depose many of those people about the facts of the case.  OfficeMax will also need to interview or depose other third parties who may have evidence refuting relator's

assertions.  But it will be impossible to do so if OfficeMax is precluded from saying the relator's name.

Further, relator's identity is relevant to several legal issues in this case.  As OfficeMax explained in its Motion to Dismiss, certain people are absolutely forbidden from acting as relators.  (Dkt. No. 39 at 9.)  In his Response, Relator did deny that he is such a person.  Relator's identity is also relevant to whether he is the original source of his allegations, 31 U.S.C. § 3730(e)(4)(A) (superseded 2009), and whether he properly disclosed his knowledge to the government before filing suit, *id.* § 3730(b)(2).

Relator's identity also may have a direct bearing on OfficeMax's ability to defend itself publicly.  Relator might be a disgruntled supplier who failed to win an OfficeMax order, or may even compete directly with OfficeMax.  Perhaps OfficeMax has claims against the relator.  For all OfficeMax (or the Court) knows, relator may be a convicted perjurer.  Surely OfficeMax could not be precluded from making such facts public.  Yet if relator has his way, that will be the result.

### 3.    Relator misconstrues the public's interest regarding anonymity.

Finally, relator argues that the public interest favors his anonymity.  The opposite is in fact true.  Requiring plaintiffs to name themselves is not only a protection for defendants; it also furthers the "public interest in knowing the facts surrounding judicial proceedings" as well as the "public interest in open proceedings…"  *Chao*, 587 F. Supp. 2d at 99.  "[H]aving judicial proceedings fully open to the public so that the public may assess the merits of the lawsuit and the quality of the courts is in the public interest,…and is a legitimate reason to require unsealing Doe plaintiffs' names."  *Qualls*, 228 F.R.D. at 13.

Requiring plaintiffs to name themselves also ensures the integrity of lawsuits:  "when courts require litigants to use real names, they encourage suits by the most zealous,

passionate, and sincere litigants, those who are willing to place their personal and public stamp of approval upon their causes of action." *Id.* "While a few valid causes of action, by plaintiffs' own choices and calculations, may stay out of court, but so will many more frivolous and less heartfelt cases, which is in the interest of both the public and the courts." *Id.*

Relator claims that the "public has an interest in ensuring that the laws of the United States be enforced and that the public fisc be protected…" (Resp. at 9.) The government, however, is fully capable of vindicating that interest without relator's involvement. The U.S. Customs and Border Protection ("Customs") has the authority to recover any duties and penalties it believes are due. The Department of Justice retains the right to file suit under the Act for any fraud it believes took place. Both organizations are aware of relator's allegations, and have sufficient tools at their disposal to recover everything they believe they may be entitled to, whether the Complaint is dismissed or not.

Relator's true interest—indeed his only interest—is the bounty he could receive under the Act. *See United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1212 (7th Cir. 1995) (a relator's "only motivation in bringing the suit is to recover a piece of the action given by the statute"). Relator thus has a simple choice: he can pursue his claim and potential bounty openly, or he can retain his anonymity by dismissing the case. What relator may not do is seek a bounty by lodging fraud charges against OfficeMax while hiding his name and hampering OfficeMax's ability to defend itself.

**B.      Relator's Claims are Based on Public Disclosures of Which He is not the Original Source.**

Turning to the merits of the Complaint, relator's allegations were publicly disclosed and relator is not the original source of the allegations.  The Court thus lacks jurisdiction and the Complaint should be dismissed with prejudice.  31 U.S.C. § 3730(e)(4)(A).

**1.      OfficeMax did not admit fraud and his discussion of Z in the *Springfield Terminal* equation is inapposite.**

Relator begins his discussion of the public disclosure bar with two mistakes.  First, he claims that by invoking the bar, "OfficeMax is effectively acknowledging its fraud and is claiming that its fraud is so infamous and notorious that anyone with knowledge of the industry should have been aware of it."  (Resp. at 9.)  Not so.  It is the *alleged facts* underpinning the supposed fraud—the physical characteristics of the pencils—that are sufficiently public.  Relator obviously has not proven, and OfficeMax has not admitted, the elements of an FCA cause of action.  Indeed, if relator's overblown argument were correct, every defendant who raises a public disclosure bar would likewise be "acknowledging its fraud."

Second, relator spends significant space discussing Z (the actual allegation of fraud) in the *Springfield Terminal* equation.  (*Id.* at 2, 10-12.)  OfficeMax contends only that X (the claimed country of import) and Y (the alleged actual country of import which relator alleges is evident from physical characteristics) were publicly disclosed.  Under *Springfield Terminal*, the public disclosure of X and Y is all that is required for the jurisdictional bar to be raised.  It is irrelevant whether or not Z was publicly disclosed, and relators' discussion of Z is a distraction.

**2.      X was publicly disclosed.**

Relator appears to concede that X was publicly disclosed, offering only that it "is arguable whether" the manifest information on which he bases his claim "represents a public disclosure…" and claiming that whether X was publicly disclosed "need not be addressed…"

(Resp. at 12.)  If relator does contend that X was not publicly disclosed, he is wrong.  The claimed country of import appears on shipping records from PIERS, a publicly-available trade publication that receives its data from vessel manifests provided by Customs.  *See* http://www.piers.com/ (last visited August 31, 2012) (PIERS provides "information services to thousands of subscribers globally"); 19 C.F.R. §§ 4.7, 103.31(a) (requiring Customs to provide vessel manifest information to the press).  The claimed country of import was thus publicly disclosed both in the "news media" and in "administrative report[s]," as 31 U.S.C. § 3730(e)(4)(A) requires.

### 3.    Y was publicly disclosed.

As to Y—the alleged actual country of import—the First Amended Complaint ("Complaint") contends that "Chinese pencils can be readily identified by their overall appearance and quality…"  (First Am. Compl. ("Compl."), Dkt. No. 22, ¶ 20.)  OfficeMax explained that most of those characteristics are available to the public on the internet, including on OfficeMax's website.  (Dkt. No. 39 at 10.)  Relator, by failing to discuss the point in his Response, effectively concedes it.  Relator likewise fails to dispute, and therefore concedes, that information available over the internet is publicly disclosed under the Act. *United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012) ("The FCA does not define 'news media,' and the courts that have considered the issues have construed the term to include readily accessible websites").  So if Chinese and non-Chinese pencils can be readily identified by their overall appearance and quality, and their appearance and quality is visible on the internet, that is sufficient to raise the public disclosure bar.

Nor is the internet the only form of public disclosure.  The physical characteristics and prices of Chinese pencils were also discussed at length in the United States International Trade Commission ("ITC") reports.  Relator does not dispute that the ITC reports are

"administrative reports" under 31 U.S.C. § 3730(e)(4)(A).  He instead argues that the ITC reports did not contain enough information corresponding to his Complaint.

The Complaint lists seven characteristics by which pencils can be identified as Chinese-made.  (Compl., ¶ 20.)  The ITC reports discuss four of them.  *See* ITC Pub. 2816 Certain Cased Pencils from Thailand, Investigation No. 731-TA-670 (1994) at II-49, II-54; ITC Pub. 3820 Cased Pencils from China (2005) at I-19 (off-center lead of poor quality); ITC Pub. 2816 at II-48; ITC Pub. 3820 at I-7 (low quality erasers and ferrules that are loose); ITC Pub. 2816 at II-54; ITC Pub. 3820 at I-19 (inferior paint quality and application); ITC Pub. 3820 at I-19 (low price).

In response, relator draws fine distinctions between the Complaint's allegations and the statements in the ITC reports, and notes that some characteristics were not discussed in the ITC reports.  (Resp. at 13-15.)  The distinctions are insufficient, because the Act's "jurisdictional bar precludes suits by individuals who base *any part of their allegations* on publicly disclosed information."  *United States ex rel. J. Cooper & Assoc., Inc. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225, 235, n. 10 (D.D.C. 2006) (emphasis in original and quotation omitted).  Here, over half of relator's allegations about pencil characteristics are based on publicly-disclosed information.

In response, relator cites *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Serv., Inc.*, 778 F. Supp. 2d 37 (D.D.C. 2011) for the proposition that a public disclosure is insufficient unless it suggests where the fraud is occurring and which specific industry participants are engaging in it.  (Resp. at 13, 16.)  That proposition is sound in the context of that case, but does not apply to the facts here.  The *Digital Healthcare* relator alleged that Medicaid programs processed payments for people with third-party insurance, when the law required third-party insurers to pay first.  *Digital Healthcare*, 778 F. Supp. 2d at 41-42.  As public disclosures, defendants cited "disclosures of the general notion that Medicaid sometimes pays claims for healthcare services for which third-party carriers should

have been charged." *Id.* at 45.  Such disclosures were insufficient, the court held.  *Id.* at 49-50.

Relator's allegations here are different.  Whether a Medicaid program should have asked a third party to pay was not something discernable from the public information. (Compl., ¶ 20.)  To determine if a particular program paid when it should not have, one presumably must have access to the program's internal financial documents as well as the insurance information for patients.  Knowing that some Medicaid program or other was making incorrect payments could not "have formed the basis for a governmental decision on prosecution" of any particular company.  *United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999).  Here, however, the Complaint claims that "Chinese pencils can be readily identified by their overall appearance and quality…" (Compl., ¶ 20.)  By relators' own assertion, no proprietary or confidential information is necessary.  *Digital Healthcare* thus does not save the Complaint.

Relator next argues that even if the physical characteristics were publicly disclosed, the characteristics themselves did not "explain why [the pencils] are of lower quality." (Resp. at 16.)  According to relator's Response, it took his investigation to determine that they are of lower quality because they were made in China.  (*Id.* at 5; Doe Decl., ¶ 11.)  But according to the Complaint, the only possible explanation for the characteristics is "the unique manufacturing processes used in China."[3]  (Compl., ¶ 20.)  Relator's investigation may have produced "additional evidence" about the country of origin, but that is not enough. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994).  The jurisdictional bar "encompasses situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud

---

[3] If (as relator's Response implies) the Complaint is wrong on this point, and the physical characteristics are not sufficient to identify Chinese-made pencils, then the Complaint fails for a different reason: it fails to allege that OfficeMax knew or should have known the country of origin.  *See infra*, Section E.

independent of the public disclosures."  *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997).

Finally, relator claims the physical characteristics are only "secondary" and were merely included in the Complaint to show that OfficeMax should have known the pencils were made in China.  (Resp. at 16-17.)  It is not clear what relator means by "secondary," but if the publicly available physical characteristics were sufficient to put OfficeMax on notice, they were also sufficient to put the government on notice.

In short, both X and Y were publicly disclosed.

**C.      Relator Failed to Show He is the Original Source of the Allegations.**

Because relator's allegations are based on publicly-disclosed information, the Court lacks jurisdiction unless he proves he was the original source of the allegations.  31 U.S.C. § 3730(e)(4)(A).  In his Response, relator did not provide any basis for claiming to be the original source.  The most he musters is that "it is *very likely* that [he] could show that he was the source or a source of the publicly disclosed information[.]"  (Resp. at 17 (emphasis added).)  Instead of responding to OfficeMax's arguments, he asks that if the Court finds his allegations were publicly disclosed, "he be given an opportunity to make such a showing." (*Id.*)  His Response was that opportunity.  *See* LCvR 7(b).  He was given an extension of time and allowed five full weeks to draft his Response.  Space was not a constraint, as his Response was 18 pages short of the limits set out in the Local Rules.  LCvR 7(e).  Relator had his chance to prove he is the original source, and chose not to try.  That choice speaks volumes, and is also dispositive.

The few facts relator has placed before the Court are, in any event, utterly insufficient to carry his burden.  In his declaration, he reports that his knowledge is based on "widespread discussion at trade shows and individual and industry meetings[,]" "investigators in Taiwan, Indonesia, and Vietnam[,]" "careful analysis of product[,]" unspecified "public and non-public trade data[,]" and conversations with "industry sources."  (Doe Decl., ¶¶ 10-11.)

Being an original source requires "direct and independent knowledge of the information[.]" *United States ex rel. Hockett, M.D. v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 41 (D.D.C. 2007).  Discussions at trade shows and conversations with industry sources involve "several layers of hearsay," which does not make one an original source.  *Id.* at 53; *see also id.* ("[I]nformation gained through intermediaries is not direct") (citation omitted).  As to "public and non-public trade data," relator does not say what the data are, or what proportion were public.  Without doing so, his review of the data cannot carry his burden to show that he is an original source.  *See J. Cooper & Assoc*, 422 F. Supp. 2d at 233 (relator bears the burden of proving jurisdiction).

Nor is it enough to hire investigators and analyze products; a relator is not an original source "simply because he conducted some collateral research and has background knowledge that allowed him to understand the significance of publicly disclosed information."  *United States ex rel. Alexander v. Dyncorp., Inc.*, 924 F. Supp. 292, 292 (D.D.C. 1996).  Even if such an investigation could be sufficient, relator has provided no information about his investigation, other than to suggest that the investigators should, like relator, have the privilege of remaining anonymous.  (*See* Doe Decl., ¶ 7.)  Finally, due to his anonymity, there is no basis to find that relator is an original source (a point that relator does not address, let alone dispute).  *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1281 (10th Cir. 2001) (a "relator's decision to withhold…his identity…kept him from meeting the jurisdictional requirements of an original source").  Relator is not the original source, and should not be granted yet a further opportunity to argue that he is.

Because his allegations are based on publicly-disclosed information of which he is not the original source, the Court lacks jurisdiction and should dismiss the Complaint, with prejudice.  31 U.S.C. § 3730(e)(4).

**D.      Relator's Allegations Fail Under Rules 8(a) and 9(b).**

In addition to dismissing for lack of jurisdiction, the Court should also dismiss the

Complaint because it fails to meet the requirements of Federal Rules of Civil Procedure 8(a)

and 9(b).  Relator misconstrues the pleading requirements.  When the correct requirements

are applied, the Complaint fails for three reasons: it does not identify a single person

involved in the purported fraud, does not allege scienter, and is based in part on information

and belief.

**1.      Relator misapprehends the requirements of Rule 9(b).**

Relator at various points in his Response suggests that Rule 9(b) merely requires

pleadings to contain enough facts "to allow Defendants to answer specific allegations of

wrongdoing; not just to deny that they have done anything wrong."  (Resp. at 3; *accord id.* at

18.)  That is one of the purposes of the Rule.  But there are others as well: to prevent

nuisance suits, to protect defendants from unsubstantiated accusations of wrongdoing, and to

preclude complaints that are only pretexts for discovery.  *United States ex rel. Bender v. N.*

*Am. Telecomm., Inc.*, 686 F. Supp. 2d 46, 50 (D.D.C. 2010); *see also Martin v. Arc of the*

*Dist. of Columbia*, 541 F. Supp. 2d 77, 83 (D.D.C. 2008).  To vindicate all those purposes,

the Rule requires complaints to "state the time, place and content of the false

misrepresentations, the fact misrepresented and what was retained or given up as a

consequence of the fraud."  *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389

F.3d 1251, 1256 (D.C. Cir. 2004) (quotation omitted).[4]

Here, relator mistakenly asserts that Rule 9(b) is satisfied by providing some

information and asking a defendant to do the rest.  Relator lists publicly available PIERS data

and then he presumes that OfficeMax can use that data to find more documents to fill in the

gaps in the Complaint.  (*See* Resp. at 19.)  But it is relator's burden, not OfficeMax's, to

---

[4] Relator notes that in three of the cases OfficeMax cited, courts found that the relators had not sufficiently
identified false claims.  (Resp. at 19.)  That does not change the rule enunciated in those cases which requires
fraud to be pled with far more particularity than in the Complaint here.

plead the facts supporting his claim.  Moreover, relator filed his Complaint over four years ago, and had not only the government's help, but also supposedly a team of investigators at his disposal.  Despite all that, he still is unable to plead more than what is already in the PIERS data, which is not nearly particular enough.  *Cf. United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1258-59 (D.C. Cir. 2004) (relator was not allowed to plead lack of access when "he and the government reviewed thousands of pages of documents" and he participated "in the government's five-year examination of reams of documents provided by" defendants).

### 2.      Unattributed statements are insufficient.

Relator claims that he is exempt from the basic rule that relators "must identify individuals allegedly involved in the fraud."  *United States ex rel. Folliard v. Hewlett-Packard Co.*, 272 F.R.D. 31, 33 (D.D.C. 2011).  His argument is that "no OfficeMax employee is listed on th[e] documents [in his possession].  Therefore, in a case involving false claims to Customs, the submission of the false claim is truly a corporate effort and the individuals involved in the fraud are irrelevant."  (Resp. at 21.)  That argument is full of flaws.

Boiled down, it is an argument that relator should be exempt from pleading requirements because he lacks sufficient knowledge to meet them.  That is not the law.  When a relator lacks facts to plead fraud sufficiently, the correct result is dismissal of the complaint, not the disregard of pleading requirements.  Moreover, a plaintiff simply may not plead "fraud through completely unattributed statements, even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993).  Relator's argument is essentially the "collective knowledge theory"—that "if a corporation has many employees or agents, you must consider the knowledge possessed by those employees and agents as if it was added together and combined into one collective pool of information."

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1273 (D.C. Cir. 2010) (citation omitted).  The D.C. Circuit Court of Appeals has roundly rejected such an approach.  *Id.* at 1274 ("[U]nder the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose").  Because relator has not identified a single OfficeMax employee involved in an alleged fraud, the Complaint runs afoul of Rule 9(b) and should be dismissed.

### 3. If the physical characteristics do not identify Chinese-made pencils, relator has not alleged scienter.

As discussed above, relator in his Response attempts to revise and supplement a crucial part of his Complaint.  According to the Complaint, "differences in the price and the physical characteristics of Chinese-made pencils" put "experienced pencil buyers…on notice of the true country of origin…without the need for direct contact with the factories actually producing the pencils" because the characteristics are the "result of the unique manufacturing process used in China."  (Compl., ¶¶ 19, 20.)  Those allegations are fundamental to the Complaint.  According to relator, the allegations were "inserted to demonstrate that Defendants had the requisite knowledge under the FCA—that they knew or should have known—that the pencils they were purchasing were of Chinese origin."  (Resp. at 17.)

However, in his effort to avoid dismissal, relator states in his Response that the "proof of fraud is dependent on the Relator's investigation establishing that the imported pencils…were not produced by the suppliers claimed by Defendants."  (*Id.* at 2.; *see also id.* at 16 ("[S]imply indicating that Chinese pencils are of a lower quality does not provide the necessary information to explain why they are of a lower quality").)

The strategy of supplementing a complaint in an opposition to a motion to dismiss is generally disfavored.  *See Ghawanmeh v. Islamic Saudi Acad.*, 672 F. Supp. 2d 3, 14-15

(D.D.C. 2009).  Outright contradicting a complaint is even more unusual.  But if the Response is correct, then relator's scienter allegations are nothing but speculation.  If even experienced pencil buyers cannot determine that pencils are Chinese-made from their physical characteristics, then the Complaint contains no allegations that anyone at OfficeMax knew (or even could have known) the country of origin.  Without such allegations, the Complaint fails to meet even the basic requirements of Rule 8.[5]

Indeed, relator effectively admits as much.  When discussing the relevant Customs forms, he mentions that a "Customs Broker" files the forms "on behalf of the importer." (Resp. at 20.)  "It is unlikely," relator explains, "that the individual clerk at the broker's office who submitted the entry was aware that it represented a false claim."  (*Id.* at 21.)  It is just as unlikely that the OfficeMax employee who provided the broker with information was so aware.  Yet it is that employee's intent that is material, given the rejection of the collective knowledge theory of fraud.  *See Sci. Applications Int'l Corp.*, 626 F.3d at 1275 (one may not "prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds").  Consequently, the "complaint pleads facts that are merely consistent with [OfficeMax's] liability," and so "it stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted).

---

[5] Relator discusses a prior disclosure OfficeMax filed with Customs in 2011, which he received from the government.  (Resp. at 18.)  First, the Complaint does not mention that relator relied on documents he received from the government, even though he apparently does.  Second, the prior disclosures are public disclosures under the Act.  *United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999), *overruled on other ground by Glaser v Wound Care Consultants, Inc.*, 570 F.3d 907, 909-10 (7th Cir. 2009) (disclosures raise the jurisdictional bar when they provide "information to a competent public official about an alleged false claim against the government…when the disclosure is made to one who has managerial responsibility for the very claims being made").  Relator is not the original source of the prior disclosures.  Third, the prior disclosures explain that any misidentification was accidental, not knowing.  (*See* Dkt. No. 46-1 (filed under seal).)  So even if the prior disclosures corresponded with relator's allegations, and even if relator were entitled to rely on them, he still has not pled the required scienter.

**4.      Relator's information and belief argument is insufficient to save the Complaint.**

In its Motion, OfficeMax noted that two of relator's allegations were improperly based on information and belief.  (Dkt. No. 39 at 15.)  Relator's rejoinder raises far more questions than it answers.  He claims that the allegations "were based on information from a very reliable source with knowledge of the pencil industry in Vietnam.  Because of the source of this information, there was no need to state that the allegation was based on information and belief."  (Resp. at 21.)  That statement does not cite relator's declaration, so it is not clear whether the "very reliable source" is also one of the investigators relator hired.  It is also not clear whether relator will ask that the source's identity be kept hidden.  It is not clear whether the source based his knowledge on publicly-available information.  It is not clear whether relator initially alleged on information and belief based on the source and has only since that time come to the conclusion that the source is "very reliable."  Finally, it is not clear if relator intends to amend his Complaint again to remove the information and belief allegation.  The only clear fact is that the current Complaint—the document being tested by OfficeMax's Motion—impermissibly contains fraud allegations based on information and belief.  *United States ex rel. Davis v. Dist. of Columbia*, 591 F. Supp. 2d 30, 36 (D.D.C. 2008) ("As a general rule, pleadings upon information and belief do not satisfy Rule 9(b)'s particularity requirement").

In sum, Relator's Complaint fails to identify any single person at OfficeMax who submitted a false claim, fails to allege that such a person had the requisite scienter, and improperly alleges fraud on information and belief.  Those failures should result in dismissal.

**E.      Count II does not State a Reverse False Claim.**

OfficeMax explained in its Motion that marking penalties may not form the basis of a reverse false claim, which required dismissal of Counts II and III.[6]  In response, relator insists that marking penalties can in fact serve as the predicate for reverse false claims, and

---

[6] Relator has now "determined to seek voluntary dismissal of Count III."  (Resp. at 22.)

that subsequent amendments to the Act abrogate *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 741 (6th Cir. 1999), one of the cases OfficeMax cited.  Relator is incorrect.

### 1.   Marking penalties, which are simply penalties for regulatory noncompliance, may not form the predicate of a reverse false claim.

Reverse false claims under the Act only arise if a false statement was submitted to conceal "an obligation to pay or transmit money…"  31 U.S.C. § 3729(a)(7).  As the D.C. Circuit explained in *United States ex rel. Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008), an "unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim[.]"  Count II is based on 19 U.S.C. § 1304(i).  (Compl., ¶ 59.)  That statute provides a ten percent penalty for failing to mark goods "in a conspicuous place legibly, indelibly, and permanently…to indicate… the country of origin of the article."  *Id.*, § 1304(a).  The statute is thus nothing but a "penalty for regulatory noncompliance," and so cannot form the basis of a reverse false claim under *Hoyte*.  Relator does not even address *Hoyte*, but it is fatal to Count II.

### 2.   *American Textile* provides a separate rationale to dismiss Count II.

Rather than discuss *Hoyte*, relator attacks the reasoning of *American Textile*— reasoning which is different from that in *Hoyte* but which nevertheless resulted in dismissal of precisely the type of claim made in Count II.  *American Textile* held that reverse false claims must be based on concrete obligations—common law debts—and may not be based on obligations that "attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties."  190 F.3d at 738.  Relator cites § 1304(i)'s language that the marking penalty "shall be levied,…shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause."  According to relator, that language strips Customs officials of discretion, and so under the reasoning of

*American Textile*, a marking penalty is a common law debt that may be a predicate for a reverse false claim.  (Resp. at 23-24.)

Relator omits a significant section of the statute.  Marking penalties may only be assessed if the "article is not exported or destroyed or…marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article[.]"  *Id.*  Relator replaces that quote with ellipses, (Resp. at 23), but it provides Customs official with discretion to allow in lieu of a penalty the exportation, destruction, or marking correction.  Indeed, Customs official may exercise such discretion up until the time of liquidation—which may be a year or more after the goods enter the country.  19 U.S.C. § 1504(a)(1); *see also* 19 C.F.R. § 159.12(a) (allowing port directors to extend the one-year liquidation period if Customs needs more information or the importer provides good cause).  Because the marking statute gives Customs officials discretion in the timing and nature of any marking penalty, it does not constitute an "obligation" on which a reverse false claim may be based.

Relator also argues that 2009 amendments to the Act abrogate *American Textile*, because certain pieces of legislative history criticize the case.  (Resp. at 26.)  The relator in *United States ex rel. Yannacopoulos v. General Dynamics*, 636 F.Supp.2d 739 (N.D. Ill. 2009), made just such an argument.  It was rejected, however, because "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment."  *Id.* at 751 (quoting *Doe v. Chao*, 540 U.S. 614, 626 (2004)).  *American Textile* retains its force.  The Court should adopt its sound reasoning and dismiss Count II accordingly.[7]

---

[7] Relator claims that imports after the Act's amendments in 2009 would still be viable under Count II.  (Resp. at 26, n.4.)  The Complaint, however, only contains allegations against OfficeMax for imports in 2006 and 2007. (Compl., ¶ 55.)

**F.      Count IV is Insufficient.**

Finally, OfficeMax moved to dismiss Count IV, which is based on laws allowing imports from certain countries to avoid the typical importing duties.  Relator acknowledges that the Complaint only alleges that OfficeMax claimed Vietnam as the country of origin for the pencils at issue.  He also acknowledges that Vietnam is not eligible for duty-free treatment of pencil imports.  Nevertheless, he asks that Count IV not be dismissed against OfficeMax.  His argument is this:  "Count IV alleges that *if* any of the Defendants declared that Chinese-made pencils originated in countries that are eligible for duty-free treatment…that they submitted false claims…"  (Resp. at 26 (emphasis added).)  So, relator argues, "*[i]f* it is shown after discovery that the [sic] OfficeMax has not imported Chinese-made pencils from countries eligible for [duty-free treatment], then the allegation should be dismissed, but not before discovery is complete."  (Resp. at 22 (emphasis added); *see also id.* at 26 ("Whether OfficeMax is libel [sic] for submitting false claims to avoid regular duties will be determined at the end of discovery").)

That is not how pleading works.  "Fundamental fairness commands that counsel should not be allowed to file a complaint first and thereafter endeavor to develop a cause of action."  *Butera & Andrews v. Int'l Bus. Mach. Corp.*, 456 F. Supp. 2d 104, 114 (D.D.C. 2006) (quotation marks and citation omitted).  It is especially inappropriate when fraud is involved, because one of the purposes of Rule 9 is "to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs."  *Martin v. Arc of the Dist. of Columbia*, 541 F. Supp. 2d 77, 83 (D.D.C. 2008) (quotation omitted).  Even now, four years after filing his initial Complaint and with substantial help from the government, relator is unable to allege that OfficeMax imported pencils from duty-free-eligible countries.  His request to rummage through OfficeMax's files in an ill-conceived fishing expedition to find some fact to support Count IV should be denied.

**G.     Conclusion**

The Complaint is fatally flawed for a number of reasons.  The Court should first

require that relator proceed with his claims publicly.  If relator decides to do so, as opposed

to voluntarily dismissing his claims, the Court should then evaluate the sufficiency of the

Complaint and dismiss it with prejudice.

DATED:  August 31, 2012                              Respectfully submitted,

                                                          _____/s/ John F. Henault Jr.___
                                                          John F. Henault Jr., D.C. Bar 472590
                                                          PERKINS COIE LLP
                                                          700 Thirteenth Street, N.W.
                                                          Washington, D.C.  20005-3960
                                                          Tel.:  (202) 654-6200
                                                          Fax:  (206) 654-6211
                                                          JHenault@perkinscoie.com

Of Counsel:                                          Counsel for Defendant
                                                          OfficeMax Incorporated

Steve Y. Koh, *pro hac vice*
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, Washington  98101
Tel.:  (206) 359-8000
Fax:  (206) 359-9000
skoh@perkinscoie.com

Counsel for Defendant
OfficeMax Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2012, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ John F. Henault Jr.*
John F. Henault Jr., Bar No. 472590
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Tel.:  (202) 654-6200
Fax:  (202) 654-6211
jhenault@perkinscoie.com

Counsel for Defendant
OfficeMax Incorporated